**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0001065
28-MAR-2013
09:49 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

IN THE INTEREST OF AS

NO. CAAP-11-0001065

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 08-11941)

MARCH 28, 2013

NAKAMURA, C.J., FOLEY AND FUJISE, JJ.

OPINION OF THE COURT BY FOLEY, J.

The Department of Human Services (DHS) appeals from the "Order Re: Trial on Placement" (Placement Order) entered on November 18, 2011, in the Family Court of the First Circuit[1] (family court). The Placement Order provides the following, in relevant part:

> 1. DHS shall maintain [AS's] placement in [her foster parents' (Foster Parents') home (Foster Home)].
>
> 2. [AS] shall not be removed from [Foster Home] except if there is imminent harm.
>
> 3. DHS shall continue to provide visitation with [AS's maternal aunt (Maternal Aunt)] and with [AS's] biological family on Oahu and her half-siblings

---

[1] The Honorable Matthew J. Viola issued the order.

[(collectively, Maternal Relatives)], in consultation with the [Volunteer Guardian Ad Litem] Program.

4. DHS's oral motion to be relieved as [AS's] permanent custodian made after the [family court] announced its decision is denied.

5. All prior consistent orders remain in full force and effect.

On appeal, DHS argues that the family court abused its discretion when it ordered DHS not to place AS with Maternal Aunt or remove AS from Foster Home. DHS maintains that the court:

(1) erred as a matter of law when it failed to follow and apply Hawaiʻi and federal child protective laws that create a preference for placing children in state foster care with their families, if appropriate, in accordance with "the liberty interest of familial association" protected by the Fourteenth Amendment of the U.S. Constitution, and instead focused on DHS's application of its 2005 family placement preference policy;

(2) erred as a matter of law by applying a contradictory and unlawful standard of proof that first required DHS to prove that its proposed placement with Maternal Aunt was in AS's best interest, and then, if DHS did not do so, required the parties opposing DHS's recommendation to prove DHS abused its discretion in making its proposed placment;

(3) erred as a matter of law by failing to consider how various orders it issued delayed commencement of the permanency trial, which negatively impacted DHS's efforts to place AS with Maternal Aunt;

(4) clearly erred in finding that DHS abused its discretion by deciding to place AS with Maternal Aunt; and

(5) erred as a matter of law by denying DHS's request to be discharged as AS's permanent custodian, after ordering DHS not to place AS with Maternal Aunt.

## I. BACKGROUND

### A. Pre-trial

### 1. Foster Family and Home

AS was drug-exposed *in utero*, and weighed five pounds, 10.9 ounces when she was born in 2008. On July 24, 2008, pursuant to her biological mother (Mother) and father's

(Father's) voluntary custody agreement, she was taken into foster custody.  The same day, DHS placed her with Foster Parents.

Foster Parents are not biologically related to AS.  At the time of the placement trial, in October 2011, the foster mother (Foster Mother) had been a foster parent/resource care-giver to approximately twenty-four children, mostly babies, since 2005.  In 2008, she adopted a foster daughter, who was eight years old by the time of trial.  Also in 2008, DHS approved Foster Home, located on Oʻahu, as an emergency shelter.

Foster Mother had a biological daughter who lived at Foster Home when AS was placed there.[2]  Foster Mother also had an adult biological son, who lived on the Mainland at all relevant times.  Foster Mother owned her own business.  In 2009, she married AS's foster father (Foster Father), who was a handyman and had two children from a prior relationship.

Maternal Aunt lived on Maui and worked as a special education teacher.  She was divorced in 2009.  Her five-year-old daughter lived with her.  Maternal Aunt had been a foster mother to her nephews from 2003 to 2007.

### 2.   Petition for Foster Custody

On August 7, 2008, DHS filed a Petition for Foster Custody.  In August 2008, AS's case was assigned to social worker Judith Tarpley (Tarpley).

On August 28, 2008, DHS removed AS from Foster Home and placed her in the home of family friends (Family Friends) who had previously fostered one of AS's half-siblings.

On September 25, 2008, DHS convened an Ohana Conference attended by Mother, Father, a maternal uncle, two maternal aunts, Foster Parents, and Tarpley, but not Maternal Aunt.

On February 3, 2009, DHS removed AS from the home of Family Friends at their request and returned AS to Foster Parents.  AS remained with Foster Parents continuously from that time on.

---

[2]  Foster Mother's biological daughter had gone to college in California by the time of the placement trial.

### 3. Motion for Permanent Custody

In June 2009, Tarpley asked Foster Parents if they were interested in adopting AS, and they said that they were. On June 29, 2009, DHS filed a Motion for Order Awarding Permanent Custody and Establishing A Permanent Plan (Motion for Permanent Custody). DHS submitted a proposed permanent plan, in which DHS recommended that the court award it permanent custody of AS, whom Foster Parents wanted to adopt.

In October 2009, Maternal Aunt applied to be AS's foster parent,[3] and DHS approved her for placement. At a pretrial hearing on October 28, 2009, counsel for DHS stated that although DHS had determined that Maternal Aunt was a possible viable placement option, DHS wanted to give Father more time to reunify with AS before placing her with Maternal Aunt. The family court granted the request.

Mother stipulated to the termination of her parental rights, and after a trial on DHS's Motion for Permanent Custody, Father's parental rights were terminated.[4]

On April 8, 2010, DHS filed a Motion for Immediate Review to Move Child to Maui, in which it recommended placement of AS with Maternal Aunt because "DHS strives to place children with relatives." On April 16, 2010, the Volunteer Guardian Ad Litem (VGAL), Michelle Dean (Dean), filed a Motion to Retain Placement, in which she moved the family court to keep AS in Foster Home on the ground that removal could disrupt AS's primary attachment development process. At a hearing on the motions, the court denied DHS's motion without prejudice and granted Dean's motion.

In a report dated July 22, 2010, Department of Health, Early Intervention Section clinical psychologist Dr. Jennifer Takahashi (Takahashi) reported that AS was referred to her for consultation, even though AS did not qualify for developmental

---

[3] Maternal Aunt testified that she contacted Tarpley in February 2009 and told her she was ready to care for AS, but that point is contested.

[4] Father later appealed from the order awarding permanent custody, and this court entered a summary disposition order affirming the order.

services, because there were concerns about her behavior following her visit with a maternal uncle. AS's behavior had improved, and she seemed happy and secure. Dr. Takahashi made recommendations regarding AS's future contact with and possible transition to the home of Maternal Aunt, and continued to observe AS and report on her observations for some time thereafter.

### 4. Foster Home Certification and Maternal Aunt's Motion to Intervene

The family court set a placement trial for October 4, 2010. Prior to trial, DHS advised the court that it would be revoking Foster Parents' certification pursuant to the Hawai'i Administrative Rules (HAR) § 17-1625-17(d)(1)(A)[5] because Foster Father had a 1990 conviction for robbery. The court continued the trial due to the licensing issue.[6]

On October 13, 2010, Foster Parents filed a motion for an order requiring DHS to certify their home and for a placement trial (Motion to License Home and for Trial).

Also on October 13, 2010, Foster Parents filed an Ex Parte Motion for Restraining Order (Motion for Restraining Order), in which they sought to prevent DHS from revoking their certification and removing AS from their home without evidence that she was in danger of imminent harm. They asked to keep AS until the family court held a hearing on their Motion to License Home and for Trial. In an order dated October 13, 2010, the

---

[5] HAR § 17-1625-17(d)(1)(A) provides:

> (d) The resource family and all adult household members shall be of reputable and responsible character and shall not have a criminal history record or background which poses a risk to the health, safety, or well-being of children in care.

> (1) The resource family and adult household members shall not have any of the following:

>> (A) A felony conviction, at any time, for child abuse or neglect, for spousal abuse, for a crime against children (including child pornography), or for a crime involving violence, including rape, sexual assault, or homicide, but not including other physical assault or battery[.]

[6] The trial was continued multiple times and was eventually held on October 3, 5, and 6, 2011.

court granted the Motion for Restraining Order.

On October 18, 2010, the family court held a hearing on the Motion to License Home and for Trial where they orally granted the motion and stayed de-certification of Foster Home until further order. The court set the trial for December 15, 2010.

On December 15, 2010, the family court conducted a hearing on the Motion to License Home and for Trial. The court held that robbery, which was a crime against property, was not a crime of violence within the context of HAR § 17-1625-17(d)(1)(A). The court set aside trial for that day and ordered DHS to keep AS in Foster Home and not revoke Foster Parents' license until a hearing to be held on January 12, 2011. The same day, the family court filed an order reflecting its oral rulings. On December 22, 2010, DHS filed a motion for reconsideration of the order.

On December 30, 2010, the family court filed an order granting the Motion to License Home and for Trial. The court stayed DHS's revocation of Foster Parents' certification until further order, ruled that AS would remain with Foster Parents, and rescheduled the placement trial.

On January 12, 2011, the family court heard DHS's motion for reconsideration of the December 15, 2010 order rejecting DHS's argument that robbery was a crime of violence pursuant to HAR § 17-1625-17(d)(1)(A). The family court filed an order denying the motion.

On or about April 29, 2011, DHS sent Foster Parents a letter (Certification Letter), stating that DHS had allowed the foster home certification to lapse on April 4, 2011 and could not renew it because of the robbery conviction. On May 18, 2011, Foster Parents filed a Motion for Immediate Review, in which they asked the family court to order DHS to rescind its Certification Letter.

On May 31, 2011, Maternal Aunt moved to intervene in the case. On June 15, 2011, the family court filed an order granting the motion.

On June 27, 2011, the family court filed an order in which it granted Foster Parents' Motion for Immediate Review and ordered DHS to "keep the foster home license in effect through the conclusion of the placement trial . . . ."

DHS later conceded that its position regarding de-certification had been incorrect, and issued Foster Parents an unconditional foster home certification retroactive to April 2011.

### 5. Standard of Proof

On September 15, 2011, DHS filed a trial memorandum regarding the standard of proof to be applied at trial. DHS argued that although the family court had broad statutory authority to enter orders that were in the "best interests of the child," that authority was limited by legal and constitutional requirements. Given those parameters, DHS asserted, the following standard of proof applied: the party challenging a DHS determination regarding a child's permanent placement must prove that DHS abused its discretion in determining that the recommendation was in the child's best interests. DHS cited to In re Doe, 100 Hawai'i 335, 346 n.19, 60 P.3d 285, 296 n.19 (2002)[7]; In re Doe, 7 Haw. App. 547, 784 P.2d 873 (1989) (1989 Doe); In re Doe, 101 Hawai'i 220, 231, 65 P.3d 167, 178 (2003) (March 2003 Doe)[8]; and In re Doe, 95 Hawai'i 183, 189-90, 20 P.3d 616, 622-23 (2001) (2001 Doe).[9]

On September 15, 2011, Foster Parents filed a trial

---

[7] Footnote 19 provides in relevant part that "[a]fter termination of rights, custody is given to DHS which is charged with finding a suitable home for the child." (Citation omitted.)

[8] There, the Supreme Court of Hawai'i held that "by ordering DHS illegally to place Jane in an unlicensed foster family boarding home, we believe that the family court "disregarded rules or principles of law or practice to the substantial detriment of DHS and that its decision clearly exceeded the bounds of reason." 101 Hawai'i at 231, 65 P.3d at 178 (internal quotation marks, brackets, ellipsis, and citation omitted).

[9] There, the supreme court set forth the abuse-of-discretion standard to be followed when assessing a family court decision on appeal. 95 Hawai'i 189-90, 20 P.3d at 622-23 ("[W]e will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.").

brief in which they argued:

> If the preponderance of the evidence indicates that [AS's] best interests will be served by remaining with Foster Parents[,] that should be the ruling of the Court.
>
> . . . .
>
> If the Court finds by a preponderance of the evidence that it is [AS's] best interest to remain with Foster Parents, that decision amounts to a finding that the position of the DHS constitutes an abuse of discretion.  Were this not the case then the absurd result would be that the Court would be prevented from taking action that it has found to be in the best interests of a child because the DHS has the discretion to make decisions that are not in the best interests of the child.  Such a result would not be in keeping with the policy of the Child Protective Act [(CPA)].[10]  The DHS asks the Court to focus upon its power and authority; Foster Parents ask the Court to focus upon [AS's] best interests.  In construing the acts of the legislature the courts are to seek a construction that does not create an absurd result.  Flores v. Rawlings Co., LLC., 117 Haw. 153, 164, 177 P.3d 341, 352 (2008).  It is clear from the language of Chapter 587A that the Court is vested with the final say over what outcome is in the best interests of a child.  The language that has been quoted by the DHS is the standard by which the Court's findings will be reviewed on appeal.  In making its argument, the DHS is telling the Court that the best interests of the child should be subordinated to the interest of the DHS in doing whatever it wants.  The policy of the [CPA] states:
>
> > This chapter shall be liberally construed to serve the best interests of the children affected and the purpose and policies set forth herein.
>
> HRS §587A-2.  Any DHS' [sic] position that is determined not to be in [AS's] best interests is an abuse of the discretion that has been vested in the Department by the legislature.

Foster Parents maintained that keeping AS with them was in her best interest.

### B.  Trial

### 1.  Standard of Review

The placement trial was held on October 3, 5, and 6, 2011.  The main issue at trial was whether AS should continue living at Foster Home, as Foster Parents and Dean argued, or be moved to Maternal Aunt's home, as DHS and Maternal Aunt argued.

At the beginning of trial, the family court heard arguments regarding the relevant standards of review.  Counsel for DHS maintained that the court should apply an abuse-of-discretion standard; if the family court found DHS clearly erred in finding that placing AS with Maternal Aunt was in AS's best

---

[10]  The CPA is codified in HRS Chapter 587A.

interest, the family court should conclude that DHS's placement decision was an abuse of discretion. Counsel for Maternal Aunt argued that Foster Parents and Dean had the burden to prove that DHS abused its discretion in making its placement decision.

Counsel for Foster Parents argued that the family court had the authority to determine what was in AS's best interest, regardless of whether the evidence showed DHS abused its discretion in making its placement decision. Counsel contended, "[I]f the Court finds that it's in [AS's] best interest to . . . remain with [Foster Parents] . . . that should be the decision and that is in and of itself a finding that [DHS] has abused its discretion." Counsel distinguished the circumstances in this case from those in 1989 Doe by arguing that this court's ruling in that case was appropriate in 1989, when the "best-interest" standard was still developing.

Counsel for the VGAL program agreed with Foster Parents and argued that the applicable statute was HRS § 587A-33(b)(5) (Supp. 2010).[11] Counsel stated that the VGAL Program's position

---

[11] HRS § 587A-33 provides in relevant part:

§587A-33 **Termination of parental rights hearing.** (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:

(1)  A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;

(2)  It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;

(3)  The proposed permanent plan is in the best interests of the child. In reaching this determination, the court shall:

(A)  Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and

(B)  Give greater weight to the presumption that

(continued...)

9

had not changed since it filed its Trial Memorandum on September 28, 2010.  There, citing to <u>March 2003 Doe</u>, the VGAL Program argued that "DHS's discretion in placement is always subject to judicial review.  If this Court decides adoption by [Foster Parents] is in [AS's] best interests, it *per se* finds that DHS abused its discretion in selecting [Maternal Aunt's] home."

The family court made its ruling regarding the standard of review:

> THE COURT:  Let me tell you what I've concluded with respect to what the -- the relevant standards are for the Court to apply in this case. . . . I believe that the standard of review would be best interest. . . . And although I think the -- in every case, whoever is making the decision as to placement of a child or who should have custody of a child, that the best interest . . . is the only consideration.  But I have to take into account what the statutory scheme is and what the still good law controlling case law is from our appellate courts.  And 587A-15(d)(2) [(Supp. 2010)][12] gives [DHS] the authority to make placement

---

[11](...continued)

> the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care; and

(4)  The child consents to the permanent plan if the child is at least fourteen years old, unless the court consults with the child in camera and finds that it is in the best interest of the child to proceed without the child's consent.

(b)  If the court determines that the criteria set forth in subsection (a) are established by clear and convincing evidence and the goal of the permanent plan is for the child to be adopted or remain in permanent custody, the court shall order:

(1)  That the child's parent's parental rights be terminated;

(2)  Termination of the existing service plan and revocation of the prior award of foster custody;

(3)  That permanent custody of the child be awarded to an appropriate authorized agency;

(4)  An appropriate permanent plan; and

(5)  The entry of any other orders the court deems to be in the best interests of the child, including restricting or excluding unnecessary parties from participating in adoption or other subsequent proceedings.

[12]  HRS § 587A-15(d)(2) provides, "[i]f an authorized agency has permanent custody, it has the following duties and rights:
     . . .

(2)  Determining where and with whom the child shall live; provided that the child shall not be placed outside the State
(continued...)

10

decisions as to a child. However, . . . that decision is reviewable.

And under [1989 Doe, 7 Haw. App. at 558-59,] the Court makes clear that the Family Court reviews [DHS's] placement decisions under the clearly erroneous standard. And -- and therefore, I will apply that standard in this case.

But the -- just so we're -- everybody has got full notice of what I believe the relevant standards are, the placement decision is an ultimate fact that [DHS] has made its own determination of or assessment of. In reviewing that decision for this trial, the Court will review that finding under the clearly erroneous standard. And the burden of proof, therefore, would be on the parties that disagree with [DHS's] determination. And the relevant evidentiary standard would be preponderance of the evidence.

But clearly erroneous could be established in one of two ways. One is that there lacks substantial evidence to support [DHS's] decision or despite substantial evidence, the review in [sic] court is left with the definite and firm conviction that a mistake has been made. And I think that -- standard, those relevant considerations require the Court to determine on its own whether the placement -- what the best interests of [AS] in this case are and then in light of that to apply the established standards for review and decisions under the clearly erroneous standard. That would require the Court then to determine whether that decision [DHS] made . . . lacks substantial evidence or whether despite there being substantial evidence a mistake has been made in [DHS's] assessment of what is in [AS's] best interest. Okay?

## 2. Testimony

Dina Koyanagi's (Koyanagi's) testimony

Koyanagi testified that in January 2010, she was the case management social worker assigned to AS's case. Annabell Togle-Wilson (Togle-Wilson) was the case worker before Koyanagi, and Tarpley was the case worker before Togle-Wilson. In reviewing the case history and records, Koyanagi found out that Maternal Aunt had a "courtesy child specific license." Koyanagi asked about possibly placing AS with Maternal Aunt and was told that a court order prevented DHS from placing AS at that time.

Maternal Aunt was not initially considered as a foster parent for AS. Maternal Aunt did not attend an August 2008 Ohana Conference, but it may have been because she was not contacted. In February 2009, Maternal Aunt first contacted DHS regarding the possibility of caring for AS. She said she would not be

_____

[12] (...continued)
without prior order of the court[.]"

11

available until that summer, when she had earned her Master's degree. Despite what Maternal Aunt told Koyanagi, in an April 8, 2009 licensing log of contacts, Tarpley stated she was filing for permanency as no family members had expressed interest in caring for AS. According to a May 2009 permanent plan, Maternal Aunt was not interested in being considered as a resource parent.

In the Fall of 2009, AS may have had telephone contact with Maternal Aunt. Maternal Aunt visited AS when she was in town.

In October 2009, DHS issued to Maternal Aunt a "child specific license" for the purpose of moving AS to her home in November. For some reason, AS was not placed with Maternal Aunt.

On October 28, 2009, the family court ordered DHS to make its best or reasonable efforts to increase AS's visits with Father. In researching the case, Koyanagi assumed the court order prevented DHS from placing AS with Maternal Aunt because Maternal Aunt lived off-island, making it nearly impossible to increase visits with Father.

Perhaps in February 2010, Foster Mother reported to Koyanagi that Tarpley told Foster Mother that DHS had ruled out family members for possible placement with AS. Tarpley asked Foster Mother if she was interested in adopting AS. DHS decided to move AS on or around April 16, 2010, to Maternal Aunt's home.

In 2004-2005, then-director of DHS, Lillian Koller, publicly pronounced that DHS had a policy of placing children with relatives. DHS did not blindly adhere to a policy of placing foster children with relatives but believed that such placements were better for children. Koyanagi personally thought it was best in the long-run for children to have family connections. DHS preferred to place AS with Maternal Aunt because she was a relative and would provide AS with access to her extended family.

In June 2010, DHS transferred AS's case to its permanency unit. In July 2011, Koyanagi took over as supervisor of the permanency unit at DHS. From June 2010 to July 2011, AS continued to have contact and visits with Maternal Aunt. AS made

transitional visits to Maternal Aunt's home, under the auspices of Dr. Takahashi. The visits helped AS's transition because they were planned out and consistent.

AS spent two continuous years with Foster Parents, since February 2009, and no more than a month or two total with Maternal Aunt. AS considered Foster Parents her parents and had bonded with their other daughters (collectively, Foster Sisters). AS's relationship with Foster Parents was stronger than her relationship with Maternal Aunt; however, a child who had formed an attachment and bond with parents could later attach and bond with a new parent.

Koyanagi believed that a child's contact with relatives was important because it could provide information about the child's family history, roots, heritage, and culture; however, Koyanagi could cite to no definitive study showing that children adopted by relatives do better than children adopted by non-relatives.

Koyanagi testified that DHS considers whether a potential foster parent has a history of childhood abuse and emotional neglect, which bears on their parenting abilities. If a potential foster parent has unresolved issues, it could impact their ability to care for a child. Koyanagi did not know if Maternal Aunt had suffered any childhood abuse or neglect, despite Maternal Aunt's statement in a DHS questionnaire that she suffered physical neglect and abuse, sexual and emotional abuse, and major emotional neglect as a child. Koyanagi testified that Foster Father's childhood sexual abuse would also be a concern for DHS.

Nothing regarding the Foster Home or changes in AS's needs made her removal to Maternal Aunt's home necessary. If it were not for AS and Maternal Aunt's blood relationship, there would be no reason for DHS to recommend placing AS with Maternal Aunt.

DHS's position was that AS should maintain contact with Foster Parents if she were adopted by Maternal Aunt, and vice-versa. However, because Foster Parents and Maternal Aunt's

relationship had deteriorated, Koyanagi was no longer sure that Maternal Aunt would encourage and foster AS's contact with Foster Parents.

### Julie Tsutsui's (Tsutsui's) testimony

Tsutsui, a DHS social worker assigned to the Central Permanency Unit, testified she was assigned to AS's case in July 2011. Koyanagi was her supervisor.

Tsutsui prepared a supplemental report dated September 12, 2011, which included the basis for DHS's recommendation, beginning in October 2009, that AS be placed with Maternal Aunt. On direct examination, Tsutsui testified that the recommendation was based mainly on Maternal Aunt's status as a relative, but also on the bond between her and AS, her willingness to accommodate AS, and the opportunity she would provide for AS to continue her relationship with her extended family and learn about her family background. On cross-examination, Tsutsui stated that it was DHS's policy to favor relative placements that distinguished Maternal Aunt's home from Foster Home. The decision to place AS with Maternal Aunt was made before Tsutsui ever became involved in the case.

Tsutsui had observed AS's interactions with Maternal Aunt during two visits and four pick-ups and drop-offs, for a total of about two-and-a-half to three hours. The interactions were positive. AS was excited to see Maternal Aunt and tell her things. When she was with Maternal Aunt, AS, of her own volition, referred to her as "Mommy." AS had formed an attachment with Maternal Aunt through monthly overnight stays with her. On cross-examination, however, Tsutsui testified that the attachment AS had to Maternal Aunt was no different from the attachment a child would have to a regular babysitter.

If AS were placed with Maternal Aunt, AS would have therapeutic support if she needed it. DHS would not recommend immediate adoption but instead would continue to assess the placement.

When AS visited with Maternal Aunt on O'ahu, AS saw her extended family, including Maternal Aunt's brother and his wife,

who had adopted AS's older siblings.  However, none of AS's blood relatives, besides her Maternal Aunt, lived on Maui.

DHS's assessment was that Foster Family and Maternal Aunt's family were both good.  The relationship between Foster Parents and Maternal Aunt was at that point very tenuous, stressful, and untrusting.

On July 4, 2011, there was an incident at the Foster Home in which a neighbor with a drinking problem came over and started talking negatively about his wife in front of Foster Family, including AS.  When Foster Father tried to escort him out, he scratched Foster Father's face, and Foster Father punched him.  DHS's position was that Foster Father had acted appropriately to protect Foster Family.  A psychological evaluation showed that Foster Father had an anger problem and needed therapy.  Tsutsui thought he was undergoing treatment but was not sure.  In September 2011, AS mentioned the incident to her therapist.

On cross-examination, Tsutsui acknowledged that Maternal Aunt had made inconsistent statements to DHS regarding her father.  On one hand, she spoke of her father in purely positive terms.  On the other hand, in reports she filled out for Foster PRIDE (a certification training program), she indicated that she had been subjected to childhood physical neglect and abuse, sexual and emotional abuse, and major emotional neglect.  She also reported that her brothers and sisters ran away to her mother's home because of abuse.  Tsutsui testified that it was important to DHS that potential foster parents reveal whether they experienced trauma growing up, but people were not always forthcoming initially about negative aspects of their personal backgrounds.  They wanted to present themselves in a positive light and may have difficulty talking about negative experiences.

Tsutsui testified that she was unaware of Maternal Aunt's report that during her prior marriage, her husband abused drugs and alcohol, even though that would be important information for DHS to know about a prospective resource parent.

On redirect examination, Tsutsui testified that Foster

Father also had inconsistently reported his childhood abuse and neglect. In psychological evaluations of Foster Mother, Foster Father, and Maternal Aunt respectively, the psychologist stated that each of the parties had been guarded.

On cross-examination, Tsutsui testified that it would be traumatic for AS to be removed from Foster Home and separated from Foster Sisters, and AS would need support from Maternal Aunt and her family throughout that process. AS had formed attachments to her preschool and Sunday school teachers on O'ahu. If AS were denied contact with Maternal Aunt and Maternal Relatives, it would be a loss to AS as well.

Since Tsutsui had been on the case, Foster Parents had not offered to let AS visit with her relatives on O'ahu. However, there had been an incident in which a maternal uncle surprised Foster Parents by keeping AS overnight when he was supposed to only have her for a short time. The incident caused AS to have significant behavioral problems when she returned to Foster Family and may have made Foster Parents leery of having AS visit with Maternal Relatives on O'ahu.

### Carleen Nakata's (Nakata's) testimony

Nakata testified that she was a "matcher" at Foster Home Licensing and recommended placement homes to the assigned social worker. Nakata met Foster Parents in 2007, when Foster Home was recommended as an emergency shelter. Nakata approved Foster Home as an emergency shelter for a year, starting on April 1, 2008. Foster Mother did a "pretty good job" providing an emergency shelter, and there were no complaints about her or Foster Father.

When AS was placed with Foster Parents on February 3, 2009, Foster Mother indicated that she did not trust Maternal Aunt or want to work with her.

Nakata noted in a report that Foster Father had eighteen prior convictions, seven of which were for violating a restraining order.

On April 8, 2009, Tarpley told Nakata that she would be filing for permanent placement of AS with Foster Parents, since

no family members had come forward or expressed interest in taking AS, and Foster Mother wanted to prevent AS from being moved again. Foster Mother told Nakata that she was surprised when Tarpley asked her if she wanted to adopt AS because she thought AS was going to be reunified with family members, but Foster Mother was very willing to adopt her.

On June 18, 2009, Foster Mother told Nakata that family members who were supposed to take AS fell through, and Father wanted her. At that point, Foster Mother would have gone along with placement of AS with a relative, although she did not think any relative would take her. If no other relative could care for AS, Foster Mother was prepared to adopt her.

In a March 29, 2010 report, Nakata indicated that Foster Mother was experiencing stress as a result of news that AS may be removed to be placed with Maternal Aunt. Foster Mother stated that Maternal Aunt had brought AS home twice at about 11:30 p.m. and never called to see how she was doing. Foster Mother stated that AS would be better off with Foster Mother and Foster Mother did not trust Maternal Aunt. Foster Mother did not want to work with Maternal Aunt and was upset that AS would be placed with a family that DHS had determined was unsuitable a year earlier. She believed AS's family only wanted AS once they realized she would not suffer from dwarfism, like her Father.

Nakata testified that AS was bonding to Foster Parents and Foster Sisters. AS called Foster Mother "Mom" and appeared to thrive and improve while she was living with Foster Family.

Foster Mother's testimony

Foster Mother testified that she had a history of drug abuse, but had been sober for nearly ten years.

From February 2009, when AS was returned to Foster Mother from her placement with family, through June 2009, no family member contacted her about AS. In June 2009, Tarpley asked Foster Mother if she was interested in adopting AS, and she said yes without hesitation because AS fit in perfectly with Foster Family, and they loved her. At that point, Foster Mother was under the impression that if Mother and Father's parental

rights were terminated, Foster Mother would be the one to adopt AS.

In the past, Foster Mother had supported the transition of her other foster children to other homes or their biological parents; however, it was different with AS, whom Foster Mother had begun considering a prospective adoptee.

In the Summer of 2009, Foster Mother personally invited AS's relatives to call and visit with AS, but they never did so. Foster Mother testified that it was important for AS to visit with her half-siblings on O'ahu, but their parents never contacted Foster Mother. Foster Mother never contacted them because she was not sure she was allowed to do so. Maternal Aunt took AS to visit with her half-siblings.

When Tarpley left in July 2009, the new social worker, Togle-Wilson, never visited. Foster Mother believed it was because DHS had already decided that she would be adopting AS. In November 2009, right before Togle-Wilson left her position, she told Foster Mother that DHS planned to remove AS from Foster Home and place her on Maui. Foster Mother did not think removal would be good for AS due to the various connections she had to Foster Family and her life with them. DHS did not remove AS in November 2009.

Maternal Aunt did not attempt to contact AS until Christmas 2009, when she visited with AS twice. After both visits, Maternal Aunt returned AS to Foster Family's home at 11:30 p.m., which Foster Mother thought was inappropriate. From that time on, Maternal Aunt called AS about once a month.

Foster Mother once took AS to Maui, and AS was very naughty in the airport on the way home.

When Foster Mother told Maternal Aunt that she wanted to adopt AS, Maternal Aunt asked Foster Mother how she would explain to AS why she was the only cousin no longer in the family. Maternal Aunt said that her family took care of their own. Foster Mother responded, in part, that AS was never in Maternal Aunt's family.

Foster Mother told a psychologist during an evaluation

18

that she had spanked AS twice.  It may have been a tap over her diaper or on her hand, and Foster Mother had not been very angry at the time.

The time when the maternal uncle unexpectedly took AS overnight, Foster Mother allowed AS to go with him because she was completely caught off-guard and thought it was the right thing to do in light of DHS's desire that she maintain AS's family ties.  However, she was uncomfortable with it.  She did not call a social worker because it was a Saturday and none was available.

Foster Father's testimony

Foster Father testified that he wanted to adopt AS.  He had no problem with AS visiting her family.  He believed it would possibly be harmful for her to be removed from Foster Home because of the many relationships she had established with Foster Family and the community.

When he was younger, he was convicted for committing a number of criminal offenses and used drugs.  He spent six years in jail, then went to treatment and made an effort to get better. He had been sober for seven years.

Foster Father did not mention his child abuse on his Foster Pride questionnaire.  He received help and counseling from his family, church, friends, and psychologist to help him deal with the issues.  He was also addressing his anger problem. During the July 4th incident, when he punched his neighbor, he was not acting out of anger but to protect his family.

Maternal Aunt's testimony

Maternal Aunt was one credit away from earning her M.A. in Special Education at the University of Hawai'i at Manoa, but already eligible for her license.  She hoped to earn her degree by the end of the year.  She had been working as a special education teacher for four years and had been a volleyball coach since 2003.  She quit coaching, however, in anticipation of AS's placement with her.

Maternal Aunt's daughter was enrolled in a Hawaiian immersion school and involved in numerous extracurricular

activities.   She and Maternal Aunt spoke Hawaiian.

Maternal Aunt had seven siblings and twenty-one nieces and nephews, most of whom lived on O'ahu, while the rest lived on the Mainland.   Maternal Aunt tried to visit family on O'ahu once a month.

Maternal Aunt first heard that AS was in foster care around September 2008.   Tarpley was looking for family willing to take AS and called to see if she was interested.   Maternal Aunt said she was unable to care for AS because she was going through a divorce and in the middle of her Master's program, and did not have her own place yet, but she would be ready to take AS by the end of the summer of 2009.   Maternal Aunt first saw AS in November or December 2008, at Maternal Aunt's brother's house on O'ahu.

Maternal Aunt's divorce was finalized on January 15, 2009.   On February 19, 2009, she called Tarpley and told her that she finally had her own place and was ready to care for AS. Tarpley asked Maternal Aunt a number of questions about her ability to care for AS, then told Maternal Aunt she was already in the process of doing a home study on Maternal Aunt's niece in North Carolina.   Maternal Aunt did not tell Tarpley that she was unable to care for AS at that time.

Between February and May or June, 2009, Maternal Aunt tried two or three times to reach Tarpley, leaving her messages, but never heard back from her.   She called DHS to inquire into her status and report that she could not reach Tarpley.

Although Maternal Aunt was close to her sister and sister-in-law, neither of them told her before-hand about the Ohana Conference they attended.   Maternal Aunt's sister told her she mentioned Maternal Aunt at the conference.

Around July or August 2009, Togle-Wilson contacted Maternal Aunt and was surprised to hear that she was still interested in fostering AS.   Togle-Wilson said that Tarpley had resigned.

In September or October 2009, Maternal Aunt filled out an application to become AS's foster parent.   She wanted to take

AS because AS was her niece and ties to family were extremely crucial. AS would have connections to her culture, including Hawaiian language, and would feel more secure if she had a strong sense of her ethnic identity and family connections. Maternal Aunt had three cousins who lived nearby on Maui. Also, when Mother was pregnant with AS, she asked Maternal Aunt to take AS "if anything was to happen."

DHS did a home study at Maternal Aunt's home in October 2009. Around the end of that month, DHS told Maternal Aunt they would place AS with her the following month. Maternal Aunt did not know why, but DHS did not place AS with her.

Maternal Aunt saw AS around December 2009. She tried to reach her by phone but did not talk to her until January 2010 or see her until March 2010.

From the time she first visited AS until the time of trial, Maternal Aunt visited with AS about twenty-four times, including two times on Maui. She had about ten or twelve overnight visits with AS, including two on Maui. At first, AS had to get used to her, but by March 2010, AS was excited to see her and called her "Mommy." During the Oʻahu visits, Maternal Aunt would pick up AS at Foster Home around 9 or 10 a.m. and drop her off around 5 p.m. AS's visits to Maui in September and October 2010, were without incident. Maternal Aunt did not know why AS did not visit her on Maui again.

Maternal Aunt's daughter and AS had an immediate connection and were excited around and protective of each other, although during the first couple of visits they argued about whose mommy Maternal Aunt was. AS referred to Maternal Aunt's daughter as her "sister." AS's cousins played with her during the visits. Maternal Aunt felt strongly that AS should have a connection to them.

During AS's first couple of visits with Maternal Aunt, Maternal Aunt had to put her in time-outs for not sharing toys. Maternal Aunt would talk to her about the need to share, etc. At times, she would need to scold AS.

Maternal Aunt believed it was extremely important for

AS to continue seeing Foster Parents, although it was harder for Maternal Aunt to accept them than it had been. In the prior year, Foster Parents had hurt her feelings by failing to invite her over or return her phone calls to AS around the time of AS's birthday.

When Maternal Aunt was between the ages of three and nine, her father would give her "lickings" with his hand or rope or sometimes a belt. The childhood sexual abuse she suffered was at the hands of her brothers' friends. They would rub her legs when she sat on the couch. She had experienced childhood emotional abuse when her mother left the house and never explained why. Her ex-husband also was verbally and emotionally abusive. She experienced major emotional neglect from her parents. She had never gotten treatment for her childhood abuse and neglect.

Dean's testimony

Dean testified that it was in AS's best interest to remain with Foster Parents. AS had lived at the Foster Home consistently for two-and-a-half years and identified with Foster Family, who were everything to her. Dean was concerned that removal would traumatize AS.

Dean had observed a wonderful bond between AS and Foster Family, and the interactions among them were loving, nurturing, and compassionate. In the four interactions she had observed between AS and Maternal Aunt, Dean had seen affection, interest, and respect. Dean had spent a lot more time at the Foster Home, which she had visited at least once a month. No DHS worker had visited Maui in connection with the case. Dean had expressed interest in doing so, but DHS lacked the funds.

Dean filed a motion opposing DHS's decision to place AS with Maternal Aunt because initially the transition plan was not good. By October 4, 2010, when the family court ordered DHS, in conjunction with Dr. Takahashi, to develop a plan to transition AS from Foster Family to Maternal Aunt, the VGAL Program did not oppose it because at that time it was trying to facilitate a connection between AS and Maternal Aunt.

Dean wrote in a report that she believed Maternal Aunt was seeking foster custody of AS because Mother and their family wanted it, not because she was truly committed or it would be in AS's best interest.

### 3. Family Court's Ruling

On October 31, 2011, after the parties had submitted written closing arguments, the family court orally ruled the following with regard to its standard of review:

> As I ruled at the start of the trial, I believe that the legal analysis I must apply is as follows: First I must make an independent determination as to which placement is in [AS's] best interest. If I find that placement with [Maternal Aunt] is in her best interest, the analysis essentially ends because that's consistent with [DHS's] assessment.
>
> If, however, I determine that it is in [AS's] best interest that she maintain her placement with her [Foster Parents], I must then decide whether the [DHS] has abused its discretion in reaching the ultimate factual finding that it is in [AS's] best interest to be placed with [Maternal Aunt].
>
> I can only find an abuse of discretion if the foster parents and the VGAL program have proved that [DHS's] determination is clearly erroneous either because it lacks substantial evidence to support it or, even if there is substantial evidence to support the finding, I am left with the definite and firm conviction that a mistake has been made.

The court noted that in DHS's own Policy Directive No. 2005-7 regarding standards for relative placement, DHS states that all placement decisions are subject to family court review and does not interfere with the court's discretion to decide what is in a child's best interests. DHS's policy of placing children with relatives when possible had to be applied on a case-by-case basis and take into account all of the circumstances, i.e. what was in the children's best interests.

The family court ruled that it was not in AS's best interest to be placed with Maternal Aunt, for the following reasons:

- AS had lived thirty-four of her thirty-nine months of life with Foster Parents.

- AS considered Foster Home her home, was bonded with Foster Family, and was deeply attached to Foster Mother.

23

- AS's friends, church, school, therapist, and doctors were all tied to her current placement.

- AS's relationship with Foster Family was deeper than her relationship with Maternal Aunt.

- AS had thrived with Foster Family.

- Foster Parents had shown great commitment to AS and had followed through on and actively engaged in numerous services for themselves and AS and had been receptive to advice from service providers. They were responsible and competent.

- Foster Family had provided a safe, secure, loving and nurturing home.

- The testimony showed that if AS were removed from Foster Home, she would experience a sense of loss and trauma; it would harm AS if her contact with Foster Family were not maintained; and if placement with Maternal Aunt failed, it would be extremely traumatic to AS.

- DHS offered no specific research or studies showing that foster children do better with relatives in the long-run.

- Maintaining placement with Foster Parents did not mean that AS would have no contact with or connection to her biological family. Foster Parents credibly testified that they believed it was important for AS to maintain contact with and visit her relatives and would ensure that AS did so. In some ways, Foster Parents would be better positioned logistically to provide AS with access to her relatives, including Father, who were on O'ahu.

The family court found that DHS abused its discretion in determining that AS should be placed with Maternal Aunt based on a finding that it was in AS's best interests, which was clearly erroneous even though it was based on substantial evidence because a mistake had been made ("I find that the application of [DHS's] policy in this case for [AS] under these facts and at this time in [AS's] life is not in her best interest and is therefore a mistake.").

The family court ordered DHS to maintain and make permanent AS's placement with Foster Parents. The court ordered

DHS to continue providing AS visitation with Maternal Aunt and other relatives on Oʻahu, in DHS's discretion and in consultation with the VGAL Program.

### 4. DHS's Motion to Be Relieved as Permanent Custodian

After the family court announced its ruling, counsel for DHS and the court engaged in the following discussion:

> [Counsel]: Your Honor, as standing practice in my office, at this time [DHS] wishes to be relieved as permanent custodian of [AS] based on the Court's ruling.
>
> THE COURT: To be relieved?
>
> [Counsel]: Yes. And appoint . . . [Foster Parents] as [AS's] permanent custodian.
>
> THE COURT: Can you explain to [sic] why [DHS] is making that motion?
>
> [Counsel]: Well, it's basically the Court's ruling that we did abuse our discretion and it's basically a reflection on our fitness as permanent custodian, Your Honor. So it's standard practice coming out of my office in these situations to ask to be relieved of that --
>
> THE COURT: Okay.
>
> [Counsel]: -- [DHS] be relieved of its obligation and appoint the resource parents as the permanent custodians.
>
> THE COURT: At this point the Court will deny the motion.
>
> [Counsel]: Pardon me, Your Honor?
>
> THE COURT: The Court will deny the motion. Okay.

### C. Findings of Fact (FOFs), Conclusions of Law (COLs), and Placement Order

On November 18, 2011, the family court filed its Placement Order.

On February 6, 2012, the family court filed its FOFs/COLs. In its COLs, the court found the following:

> 1. Pursuant to HRS § 587A-15(d)(2), DHS has the authority to determine where and with whom a child in its permanent custody shall live.
>
> 2. DHS's determination that a placement for a child in its permanent custody is in the child's best interests is an ultimate finding of fact that is reviewable by the family court under the clearly erroneous standard of review. *In re Doe*, 89 Hawaiʻi 477, 487 (App. 1999) [(1999 Doe)]; [1989 Doe].
>
> 3. The court can only find that DHS has abused its

25

discretion in exercising its authority to determine where and with whom a child in its permanent custody shall live if DHS's ultimate factual finding that a placement for the child is in his/her best interests is clearly erroneous.

4. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the reviewing court is nonetheless left with a definite and firm conviction that a mistake has been made. [1999 Doe,] 89 Hawai'i at 487.

5. It is in [AS's] best interests to remain in her placement with Foster Parents.

6. It is not in [AS's] best interests to be removed from her placement with the Foster Parents and placed with [Maternal Aunt] on Maui.

7. DHS's ultimate finding of fact that placement of [AS] with [Maternal Aunt] is in her best interests is clearly erroneous, insofar as the court is left with definite and firm conviction that, despite substantial evidence in support of DHS's finding, a mistake has been made by DHS.

8. DHS has abused its discretion in exercising its authority to determine where and with whom [AS] shall live, because its determination that placement of [AS] with [Maternal Aunt] is in her best interests is clearly erroneous.

9. The court has the authority to direct DHS to maintain [AS's] placement with Foster Parents. [March 2003 Doe, 101 Hawai'i at 230-31].

10. Notwithstanding the court's findings and conclusions that DHS has abused its placement discretion in this case, there is not good cause to remove DHS as [AS's] permanent custodian.

## II. STANDARDS OF REVIEW

### A. Family Court Decisions

Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

March 2003 Doe, 101 Hawai'i at 227, 65 P.3d at 174 (quotation marks, brackets, ellipsis, internal block quotation format, and citations omitted).

### B. Family Court's FOFs and COLs

The family court's FOFs are reviewed on appeal under the clearly erroneous standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with

> a definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

March 2003 Doe, 101 Hawai'i at 227, 65 P.3d at 174 (quotation marks, ellipsis, and citations omitted).

> The family court's FOFs, as well as its determinations pursuant to HRS § 587-73(a),[13] are reviewed under the clearly erroneous standard . . . . Thus, the question on appeal is whether the record contains substantial evidence supporting the family court's determinations, and appellate review is thereby limited to assessing whether those determinations are supported by credible evidence of sufficient quality and probative value. In this regard, the testimony of a single witness, if found by the trier of fact to have been credible, will suffice. Because it is not the province of the appellate court to reassess the credibility of the witnesses or the weight of the evidence, as determined by the family court, the family court is given much leeway in its examinations of the reports concerning a child's care, custody, and welfare.

2001 Doe, 95 Haw. at 196-97, 20 P.3d at 629-30 (quotation marks, brackets, and citations omitted).

"[T]he family court's COLs are reviewed on appeal de novo, under the right/wrong standard. COLs, consequently, are not binding upon an appellate court and are freely reviewable for their correctness." March 2003 Doe, 101 Hawai'i at 227, 65 P.3d at 174 (internal quotation marks, brackets, block quotation format, and citations omitted). "Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal." Id. (internal quotation marks, brackets, and citations omitted).

### C.    Statutory Interpretation

"The interpretation of a statute is a question of law reviewable de novo." March 2003 Doe, 101 Hawai'i at 227, 65 P.3d at 174 (internal quotation marks, ellipsis, block quotation format, and citation omitted).

---

[13]    During the 2010 regular session, the legislature passed Bill No. 2716, which was enacted as Act 135, Session Law of Hawaii 2010, and codified as the Child Protective Act, HRS Chapter 587A. Act 135 was a comprehensive update of the former Child Protective Act, HRS Chapter 587. HRS § 587-73 ("Permanent plan hearing") is now codified in HRS § 587A-31 (Supp. 2010) ("Permanency hearing").

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose . . . .

Id. at 228, 65 P.3d at 175 (internal block quotation format and citation omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1-15(2) (2009 Repl.).

"Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1-16 (2009 Repl.).

## III.  DISCUSSION

### A.    Mootness

In their Answering Brief, Foster Parents argue that except for DHS's appeal from the family court's order regarding their Motion for Discharge, this appeal is moot because Maternal Aunt has not appealed from the court's decision and, thus, there is no actual controversy. We disagree.

"It has been stated that a case is moot if it has lost its character as a present, live controversy[.]" In re Doe, 81 Hawaiʻi 91, 99, 912 P.2d 588, 596 (1996) (internal quotation marks, brackets in original, and block quotation format omitted). "Thus, the mootness doctrine is properly invoked where events have so affected the relations between the parties that the two conditions for justiciability relevant on appeal — adverse interest and effective remedy — have been compromised." Id. (internal quotation marks, ellipsis, citation, and block quotation format omitted).

In this case, whether the family court applied an incorrect standard of review when reviewing DHS's placement determination and erred in overriding that determination remain "present, live controversies," regardless of Maternal Aunt's failure to appeal from the court's rulings. If we were to conclude that the court applied the wrong standard of review and/or erred in determining that DHS abused its discretion in

deciding to place AS with Maternal Aunt, an effective remedy would be available. For example, we might remand with instructions to the court to hold a new placement trial applying the correct standard of review; or we could reverse the court's rulings and instruct the court to permit DHS to place AS with Maternal Aunt (or another appropriate care-giver if Maternal Aunt were no longer willing and able to care for her). We note that Maternal Aunt's failure to appeal does not necessarily mean she is no longer interested in becoming AS's foster parent.

**B.   Standard of Proof**

**1.   Parties' Arguments**

DHS argues that the family court erred as a matter of law by applying a contradictory and unlawful standard of proof that first required DHS to prove that its proposed placement with Maternal Aunt was in AS's best interest, and then, if DHS did not do so, required Foster Parents and Dean to prove that DHS abused its discretion in making its proposal. DHS argues that the court ultimately applied a "pure 'best interests of the child'" standard, where the abuse-of-discretion standard applied. Related to this point of error is DHS's contention that COLs 2-8 are wrong.

COLs 2-8 provide:

> 2.   DHS's determination that a placement for a child in its permanent custody is in the child's best interests is an ultimate finding of fact that is reviewable by the family court under the clearly erroneous standard of review. [1999 Doe; 1989 Doe.]

> 3.   The court can only find that DHS has abused its discretion in exercising its authority to determine where and with whom a child in its permanent custody shall live if DHS's ultimate factual finding that a placement for the child is in his/her best interests is clearly erroneous.

> 4.   A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the reviewing court is nonetheless left with a definite and firm conviction that a mistake has been made. [1999 Doe,] 89 Hawai'i at 487.

> 5.   It is in [AS's] best interests to remain in her placement with Foster Parents.

> 6.   It is not in [AS's] best interests to be removed from her placement with the Foster Parents and placed with [Maternal Aunt] on Maui.

29

7. DHS's ultimate finding of fact that placement of [AS] with [Maternal Aunt] is in her best interests is clearly erroneous, insofar as the court is left with a definite and firm conviction that, despite substantial evidence in support of DHS's finding, a mistake has been made by DHS.

8. DHS has abused its discretion in exercising its authority to determine where and with whom [AS] shall live, because its determination that placement of [AS] with [Maternal Aunt] is in her best interests is clearly erroneous.

DHS argues that we must reverse the family court's placement ruling and order the court to authorize DHS to place AS with Maternal Aunt or remand the case to the court to issue such orders.

In their Answering Brief, Foster Parents argue that the family court applied the proper standard because throughout HRS Chapter 578A, the court is vested with authority to review DHS placement decisions according to what is in a child's best interests. See HRS §§ 587A-30(b)(7), -31, and -33 (Supp. 2010). The VGAL Program argues that the court applied the correct standard of review, which was to "determine on its own what placement was in AS's best interests and then apply the established clearly erroneous standard of review."

## 2. Best-interest of the Child as Appropriate Standard Of Review by the Family Court

In the proceedings below, Foster Parents and the VGAL Program urged the family court to apply a "best-interest" analysis only. They argued that a finding that DHS's placement decision was not in AS's best interest amounted *per se* to a finding that the decision constituted an abuse of discretion. DHS argued that the court must review DHS's placement decision for an abuse of discretion, and could find DHS abused its discretion if it found clearly erroneous DHS's determination that placing AS with Maternal Aunt was in AS's best interest.

The family court ultimately applied a two-prong standard of review that involved (1) independently deciding

whether DHS's placement decision was in AS's best interest;[14] and (2) if the court found the placement was not in AS's best interest, reviewing DHS's placement decision for an abuse of discretion, which meant deciding whether DHS's "best-interests" determination was clearly erroneous based on a preponderance of the evidence.

The family court based its standard of review determination largely on 1989 Doe. There, DHS petitioned the family court for the termination of the parents' physical custody, an award of foster custody to DHS, and possible permanent termination of parental rights leading to adoption. 7 Haw. App. at 549, 784 P.2d at 876. DHS appointed a Guardian Ad Litem (GAL) and placed the child in temporary foster care with caretakers (Foster Caretakers). Id.

The family court awarded foster custody to DHS and later, orally awarded DHS permanent custody. Id. Foster Caretakers intervened, wanting to adopt the child. Id. at 550, 784 P.2d at 876.

The family court held a permanency review hearing, at which DHS expressed doubts that Foster Caretakers reacted properly to certain events that occurred prior to the child's placement with them but did not suggest that they were unfit or improper people or that their home was unstable or unwholesome. Id. DHS stated in writing that Foster Caretakers had not been neglectful, but DHS had found a better life-time placement in an adoptive home where the child's two brothers lived. Id. DHS stated that it had a CPA-compatible policy of placing children with relatives whenever possible. Id. DHS argued that although a child may become emotionally tied to his or her foster parents, it does not mean the child should remain with them if a better placement is found. Id. at 551, 784 P.2d at 876-77.

The family court entered an order authorizing DHS to transfer the child from Foster Caretakers to the proposed adoptive family. Id. at 551, 784 P.2d at 877. The court later

_____

[14] The family court did not place upon DHS a burden to prove that its placement decision was in AS's best interest.

entered an Order Awarding Permanent Custody and Establishing a Permanent Plan in which it, among other things, terminated some of the birth mother's parental rights and appointed DHS permanent custodian. Id. The court also entered a Stipulation Awarding Permanent Custody and Establishing a Permanent Plan which, among other things, terminated some of the birth father's parental rights. Id. The court found that although Foster Caretakers had provided good care, the court's sole consideration must be what was in the child's best interests, and it was in her best interests to be transferred to the DHS-proposed adoptive home to be united with her brothers. Id. at 552, 784 P.2d at 877.

The GAL appealed from the order and stipulation, arguing that absent a finding that Foster Caretakers were not fit and proper persons or that their home was not stable and wholesome, HRS § 571-46(2) (1985)[15] required DHS and the family court to award custody to Foster Caretakers. Id. at 556, 784 P.2d at 879. DHS responded by citing to, among other things, HRS § 587-1 (Supp. 2002), which provided that the purpose of Chapter 587 was to provide children with an opportunity to be reconciled with their families when practicable, and permanent planning that effectuated placement with a child's own family when possible.[16] Id. at 553-54, 784 P.2d at 878.

On appeal, this court stated the following:

> Under HRS § 571-46, the determining factor with respect to child custody is the best interests of the child. On the subject of best interests, HRS § 571-46(1) accords priority to the child's parents. HRS Chapter 587 accords priority to the child's family as defined in HRS

---

[15] HRS § 571-46(2) provided in relevant part that custody may be awarded to persons other than the mother or father whenever such award serves the child's best interest, and "[a]ny person who has had de facto custody of the child in a stable and wholesome home and is a fit and proper person shall be entitled prima facie to an award of custody." Id. at 553, 784 P.2d at 878.

[16] In 1998, HRS § 587-1 was amended to emphasize an interest in promoting a child's safety and best interest over a preference for relative placements. See Nov. 2003 Doe, 103 Hawai'i at 136-37, 80 P.3d at 26-27; HRS § 587-1. The legislature has since repealed Chapter 587 and replaced it with Chapter 587A, and the purpose and construction of Chapter 587A is now provided for in 587A-2 (Supp. 2010).

§ 587-2 . . . .[17]  There are no other statutory priorities.
Thus, when HRS § 571-46(d) authorizes the award of custody to
any person who has had de facto custody of the child in a stable
and wholesome home and is a fit and proper person it does so
only whenever such award serves the best interest of the child,
subject to statutory priority in favor of the child's parents and
family.

Id. at 556, 784 P.2d at 879 (internal quotation marks, citation
and brackets omitted).  This court noted that Foster Caretakers
were neither parents nor family and found that pursuant to
HRS § 587-2, DHS had the authority to remove the child without
family-court approval.  Id.

This court went on to state:

    In well-developed areas of the law, findings of
specified material elements or criteria mandate one
conclusion of law.  In these areas, the matters or questions
of fact are decided by the fact finder and the conclusion of
law is decided by the court.  On appeal, the [FOFs] are
reviewed under the clearly erroneous standard of review and
the [COLs] is reviewed under the de novo or right/wrong
standard of review.  DeMund v. Lum, 5 Haw. App. 336, 690
P.2d 1316 (1984).

    In less-developed areas of the law, the facts permit
more than one conclusion in the discretion of the court.  In
these areas, the matters or questions of fact are decided by
either the fact finder or the court and the conclusion is
decided by the court.  If [FOFs] are entered, they are
reviewed under the clearly erroneous standard of review.
The conclusion is reviewed under the abuse of discretion
standard of review.  Heston v. Heston, 49 Haw. 521, 423 P.2d
437 (1967).

    Child custody is an area where the law has not
determined the specific material elements or criteria that
mandate a conclusion as to what custodial arrangements are
in the best interests of the child.  HRS § 571-46(5) (1985)
infers that best interests mean "the best physical, mental,
moral, and spiritual well-being of the child[.]"  The
definition of "family home" in HRS § 587-2 suggests that
best interests mean "the provision of care for the child's
physical and psychological health and welfare."  When the
child's family is unwilling or unable to provide the child
with a safe family home, HRS § 587-73(a)(3)(A) (Supp. 1988)
indicates that best interests means "to be promptly and
permanently placed with responsible and competent parents
and families in safe and secure homes[.]"

    Some considerations are universally accepted as being
relevant.  There is, however, no agreement as to the
relative priority of each of these considerations.
Consequently, currently in Hawaii, Fujikane v. Fujikane,
supra; Sabol v. Sabol, 2 Haw. App. 24, 624 P.2d 1378 (1981),

_____

    [17]  HRS § 587-2 (Supp. 1988) defined "permanent custody" as the legal
status created by court order based in part on clear and convincing evidence
that a permanent plan was in a child's best interest.  1989 Doe at 554-55, 784
P.2d at 878-79.

and in most other states, see 63 N.D.L. Rev. 481, 530 n.199 (1987), the decision as to what custodial arrangements are in the best interests of a specific child is a matter for the court's discretion. In practice, each trial judge identifies, prioritizes, and applies the considerations he or she deems relevant. Under this system, the range of permissible choices available to the trial court is virtually unlimited.

If we want to initiate the case law process of identifying, prioritizing, and standardizing the relevant considerations and their application, we must characterize the best interests decision either as a question of ultimate fact or a conclusion of law. Since we have not yet developed specific material elements or criteria, we cannot characterize it as a conclusion of law. Thus, the only alternative is to characterize it as a question of ultimate fact. That is what the courts did in *In Re Maria C.*, 527 A.2d 318 (Me. 1987), and *Ferguson v. Ferguson*, 202 N.W.2d 760 (N.D. 1972).

In light of the above considerations, we conclude that the decision as to what custodial arrangements are in the best interests of the child is a matter or question of ultimate fact reviewable under the clearly erroneous standard of review.

Our decision is consistent with HRS § 587-41 (Supp. 1988). It provides, in relevant part, as follows:

Evidentiary determination; burden of proof.
. . . .

    (b) In an adjudicatory hearing, a determination that the child has been harmed or is subject to threatened harm shall be based on a preponderance of the evidence[.]

    (c) In subsequent hearings, other than a permanent plan hearing, any determination shall be based on a preponderance of the evidence[.]

    (d) In a permanent plan hearing:

        (1) A determination that permanent custody of a child be awarded to an appropriate authorized agency shall be based upon clear and convincing evidence; and

        (2) A determination that a child should be the subject of an adoption shall be based upon a preponderance of the evidence.

Since matters of law and discretion do not involve such degrees of proof, HRS § 587-41's requirement of the preponderance and clear and convincing degrees of proof corresponds with our decision that DHS's decision that it was in Doe's best interests to remove her from Foster Caretakers' home and transfer her to the proposed adoptive home was an ultimate finding of fact.

In essence, GAL appealed DHS's adverse foster care placement decision to the family court, contending that DHS's ultimate finding of fact was clearly erroneous. Since the family court made the same finding, it obviously concluded that DHS's finding was not clearly erroneous.

> Whether a finding of fact is clearly erroneous is a question of law. Consequently, the dispositive issue is whether the family court was right or wrong in concluding that DHS's ultimate finding was not clearly erroneous. Upon a review of the record, we conclude that the family court's conclusion was right.

7 Haw. App. at 556-58, 784 P.2d at 880-81.

1989 Doe held that "the decision as to what custodial arrangements are in the best interests of the child is a matter or question of ultimate fact reviewable under the clearly erroneous standard of review." Id. at 558, 784 P.2d at 880. This holding appears to apply to family court review of a DHS best-interest finding, as well as appellate review of a family court's best-interest finding.

In its Answering Brief, the VGAL program asks us to consider overruling 1989 Doe, "to clarify that appellate standards should not apply to DHS placement recommendations, and every party may come before the family court on an equal footing." It contends that a party challenging a DHS recommendation does not have to show clear error with regard to the multitude of duties and rights vested in DHS through the CPA and should not have to do so with regard to a placement decision.

DHS is authorized "to receive children for control, care, maintenance, or placement." HRS § 587A-4 (Supp. 2010). When DHS has permanent custody, it possesses certain duties and rights set forth in HRS § 587A-15(d) (Supp. 2010); however, HRS Chapter 587A vests "exclusive original jurisdiction in a child protective proceeding" in the family court. HRS § 587A-5 (Supp. 2010).

Nowhere in the CPA is the family court required to review a DHS decision or recommendation for clear error. Rather, throughout the Act, the court is vested with the authority to issue orders and make decisions according to what is in a child's best interests. See, e.g., HRS §§ 587A-30(b)(7) (stating that at each periodic review hearing, the family court is authorized to "[i]ssue such further or other appropriate orders as it deems to be in the best interest of the child"); 587A-31(c)(2) (stating that at permanency hearings, the family court is to determine "[w]hether the current placement of the child continues to be

appropriate and in the best interest of the child or if another in-state . . . placement should be considered"); 587A-33(a)(3) (stating that in a termination of parental rights hearing, if the family court finds that there is clear and convincing evidence to support a decision to terminate parental rights, the court should determine if a proposed permanent plan is the a child's best interests).

Hawai'i appellate courts have cited to the subject holding in 1989 Doe only in the context of appellate review of family court best-interest determinations. See, e.g. In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001); Maeda v. Maeda, 8 Haw. App. 139, 143, 794 P.2d 268, 270 (1990). We can find no Hawai'i case besides 1989 Doe in which an appellate court has held that the family court should review for clear error a DHS determination that a placement decision is in a child's best interest.

In the interest of clarifying the law on this point, this court overrules the holding in 1989 Doe that "the decision as to what custodial arrangements are in the best interests of the child is a matter or question of ultimate fact reviewable under the clearly erroneous standard of review," Id. at 558, 784 P.2d at 880, insofar as it applies to a family court's review of a DHS determination that its placement decision is in a child's best interest.[18] We conclude that the family court, based on the evidence presented, must make its own determination regarding whether the placement of the child is in the child's best interest.

Although it was issued when HRS Chapter 587 was still in effect, March 2003 Doe supports our holding. There, the GAL and DHS disagreed about what foster placement was in the child's best interest. 101 Hawai'i at 228, 65 P.3d at 175. DHS argued that HRS § 587-2 (1993) expressly vested in DHS the duty and right to determine where and with whom a foster child shall be

---

[18] This court does not disturb the holding in 1989 Doe as far as it applies to an appellate court's review of a family court's decision that a custodial arrangement is in a child's best interest.

placed in foster care, and the family court could "not award foster custody to an authorized agency and simultaneously restrict that agency's statutory placement authority as a foster custodian." Id. (footnote omitted).

The GAL responded that the family court possessed the authority to review and restrict DHS's placement authority according to what was in a child's best interest, notwithstanding the court's award of foster custody to DHS. Id. at 229, 65 P.3d at 176.

> The Hawai'i Supreme Court stated the following:

> > The legislature enacted HRS chapter 587 "to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm." See HRS § 587-1 (Supp. 2002). The legislature expressly found that "children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes" in order to provide them with the greatest opportunity "to realize their full educational, vocational, and emotional potential." Id. In order to effectuate the foregoing purposes, HRS § 587-1 states that "[t]his chapter shall be liberally construed to serve the best interests of the children . . . ."

> > Moreover, HRS § 571-11(9), see supra note 5, provides that "the [family] court shall have exclusive original jurisdiction in proceedings . . . [f]or the protection of any child under chapter 587." The primary goal of the family court's jurisdiction in HRS chapter 587 cases is to "prevent harm to the child," see In re Doe Children, 96 Hawai'i 272, 285, 30 P.3d 878, 891 (2001), by ascertaining what custodial arrangements are in the best interests of the child — i.e., the "best physical, mental, moral, and spiritual well-being of the child," see HRS § 571-46(5) (Supp. 2002). See also In re Jane Doe, Born on June 4, 1987, 7 Haw. App. 547, 557, 784 P.2d 873, 880 (App. 1989) ("[T]he range of permissible choices available to the [family] court is virtually unlimited."). HRS § 587-71(d), see supra note 2, provides that, "[i]f the court determines that the child's family home is not a safe family home, . . . the court shall vest foster custody of the child in an authorized agency and enter such further orders "as the court deems to be in the best interests of the child." (Emphasis added.) See also In re Doe Children, 96 Hawai'i at 286, 30 P.3d at 892.

> > In the event that the family court designates DHS as the authorized agency to receive a child for placement, the designation endows DHS, as the foster custodian of a child, with certain rights and duties . . . . In addition, the CPA vests DHS with the authority to adopt rules and regulations to effectuate the purposes of all public assistance programs, including foster child placement.

Id. at 229-30, 65 P.3d at 176-77 (footnote omitted).

The supreme court held that pursuant to its authority under HRS § 587-1 to enter "such further orders as the court

deems to be in the best interests of the child," the family court could require DHS to refrain from moving the child. Id. at 231, 65 P.3d at 178.

Since 1989 Doe was issued, the purpose of the CPA as described in the HRS has remained substantially similar in all relevant respects. See HRS § 587A-2. Further, as we have discussed, the family court still retains exclusive, original jurisdiction in cases falling under the CPA. HRS § 587A-5. Although the "further orders" language is no longer included in the CPA, HRA § 587A-31 vests the court with the authority to determine at permanency hearings "whether the current placement of the child continues to be appropriate and in the best interest of the child or if another in-state . . . placement should be considered."

### 3. The Court's Application of the Abuse-of-discretion Standard Was Harmless Error

DHS argues that it has discretion to determine a child's permanent placement pursuant to HRS § 587A-15(d)(2) and March 2003 Doe; thus, an opposing party must prove that the determination was an abuse of discretion.

HRS § 587A-15(d)(2) characterizes DHS's permanent placement authority as a "duty" and a "right," but nowhere suggests that DHS may exercise that authority in its discretion.[19] This contrasts with other parts of the Act that do vest DHS with discretion. See HRS §§ 587A-9 (Supp. 2010) (vesting DHS with the discretion to assume temporary foster custody of a child if it determines the child is subject to imminent harm while in the custody of his or her family); 587A-15(c)(1) (Supp. 2010) (stating that a child's family retains the right of reasonable visitation at the discretion of the authorized agency or the court); 587A-26(e)(3) (Supp. 2010) (stating that the court may order reasonable visitation to a child's family at the discretion of the GAL, DHS, or another

---

[19] HRS § 587A-15(d)(2) provides, "[i]f an authorized agency has permanent custody, it has the following duties and rights: . . . (2) Determining where and with whom the child shall live; provided that the child shall not be placed outside the State without prior order of the court."

authorized agency). We presume the legislature intentionally declined to vest DHS with discretion to make placement decisions. See In re Water Use Permit Applications, 94 Hawai'i 97, 9 P.3d 409 (2000) (internal quotation marks, brackets, and citations omitted) (stating that "where the legislature includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that the legislature acts intentionally and purposely in the disparate inclusion or exclusion.").

March 2003 Doe is inapposite on this point. There, the Hawai'i Supreme Court held that DHS's licensing authority, not DHS's placement authority, was discretionary. 101 Hawai'i at 231, 65 P.3d at 178.

In this case, the family court provided no authority for its application of the abuse-of-discretion standard. It appears that the court assumed the standard was part-and-parcel of the clear-error standard. DHS cites to no persuasive authority to support the notion that it had discretion to make placement decisions, and we find none. The court erred in reviewing DHS's placement decision for an abuse of discretion. However, the court's error was harmless in that its application of the abuse-of-discretion standard did not affect the result.

### C. Scope of Review

DHS argues that the family court exceeded its scope of review in independently deciding what was in AS's best interests:

> While the Hawaii ICA ruled [in 1989 Doe] that the family court's review of DHS' decision was tantamount to an appeal, it is different from standard appeals, including administrative appeals to circuit court because the family court hears evidence while in other appeals the review is limited to the record. The family court's review of DHS' discretionary placement decision must be based on the evidence that DHS considered in making its decision, not the family court's "independent" determination of what the family court believes to be in the child's best interests.

DHS appears to argue that although a family court's review of a DHS decision is different from an administrative appeal, the court is still bound by HRS § 91-14(f)(2012 Repl.) ("Judicial review of contested cases"), which limits judicial review to the record in agency appeals. HRS § 91-14 does not apply in this

case. 1989 Doe did not hold that the family court's consideration of the evidence was limited to what was before the DHS. DHS provides no authority to support its argument, and we find none. The court did not err by independently determining what placement was in AS's best interests.

### D. Ultimate Ruling and FOFs

DHS argues in the alternative that even if the family court applied the correct standard of review, its ultimate ruling that AS should remain with Foster Parents is clearly erroneous and COLs 5-8 are wrong because they are based on clearly erroneous FOFs 113, 114, and 116.

FOFs 113, 114, and 116 provide:

> 113. It is in the best interests of [AS] to remain in her placement with Foster Parents.
>
> 114. It is not in [AS's] best interests to be removed from her placement with the Foster Parents and placed with [Maternal Aunt] on Maui.
>
> . . . .
>
> 116. Based upon all of the evidence, the court is left with a definite and firm conviction that a mistake has been made by DHS in determining that that [sic] it is in [AS's] best interests for her to be removed from Foster [Home] and placed with [Maternal Aunt].

FOFs 113, 114, and 116, which are ultimate findings of fact, are not clearly erroneous because they are based on substantial evidence in the record on appeal, including the transcripts of the permanency trial.

### E. Federal and State Law Preference for Relative Placements

DHS argues that the family court erred as a matter of law when it failed to follow and apply Hawai'i and federal child protective laws that create a preference for placing children in state foster care with their families, if appropriate, in accordance with "the liberty interest of familial association" protected by the Fourteenth Amendment of the U.S. Constitution. DHS maintains that the court "erred by focusing on DHS' family placement policy preference (that is in accord with Federal and Hawaii law)."

### 1. Hawai'i Law

DHS argues that HRS §§ 587A-2,[21] -7,[22] -9,[23] and -10[24]

---

[21] HRS § 587A-2 provides:

**§587A-2 Purpose; construction.** This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm. Furthermore, this chapter makes provisions for the service, treatment, and permanent plans for these children and their families.

The legislature finds that children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes. The legislature finds that children who have been harmed or are threatened with harm are less likely than other children to realize their full educational, vocational, and emotional potential, and become law-abiding, productive, self-sufficient citizens, and are more likely to become involved with the mental health system, the juvenile justice system, or the criminal justice system, as well as become an economic burden on the State. The legislature finds that prompt identification, reporting, investigation, services, treatment, adjudication, and disposition of cases involving children who have been harmed or are threatened with harm are in the children's, their families', and society's best interests because the children are defenseless, exploitable, and vulnerable. The legislature recognizes that many relatives are willing and able to provide a nurturing and safe placement for children who have been harmed or are threatened with harm.

The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families if the families can provide safe family homes, and with timely and appropriate service or permanent plans to ensure the safety of the child so they may develop and mature into responsible, self-sufficient, law-abiding citizens. The service plan shall effectuate the child's remaining in the family home, when the family home can be immediately made safe with services, or the child's returning to a safe family home. The service plan shall be carefully formulated with the family in a timely manner. Every reasonable opportunity should be provided to help the child's legal custodian to succeed in remedying the problems that put the child at substantial risk of being harmed in the family home. Each appropriate resource, public and private, family and friend, should be considered and used to maximize the legal custodian's potential for providing a safe family home for the child. Full and careful consideration shall be given to the religious, cultural, and ethnic values of the child's legal custodian when service plans are being discussed and formulated. Where the court has determined, by clear and convincing evidence, that the child cannot be returned to a safe family home, the child shall be permanently placed in a timely manner.

The policy and purpose of this chapter includes the protection of children who have been harmed or are threatened with harm by:

   (1) Providing assistance to families to address the causes for abuse and neglect;

   (2) Respecting and using each family's strengths, resources, culture, and customs;

(continued...)

[21](...continued)
       (3) Ensuring that families are meaningfully engaged and children
           are consulted in an age-appropriate manner in case planning;

       (4) Enlisting the early and appropriate participation of family
           and the family's support networks;

       (5) Respecting and encouraging the input and views of caregivers;
           and

       (6) Ensuring a permanent home through timely adoption or other
           permanent living arrangement, if safe reunification with the
           family is not possible.

     The child protective services under this chapter shall be provided
with every reasonable effort to be open, accessible, and communicative
to the persons affected by a child protective proceeding without
endangering the safety and best interests of the child under this
chapter.

     This chapter shall be liberally construed to serve the best
interests of the children affected and the purpose and policies set
forth herein.

[22]   HRS § 587A-7 provides:

     **§587A-7  Safe family home factors.**  (a) The following factors
shall be fully considered when determining whether a child's family is
willing and able to provide the child with a safe family home:

       (1) Facts relating to the child's current situation, which
           shall include:

           (A) The child's age, vulnerability, and special needs that
               affect the child's attachment, growth, and development;

           (B) The child's developmental, psychological, medical,
               and dental health status and needs, including the names of
               assessment and treatment providers;

           (C) The child's peer and family relationships and bonding
               abilities;

           (D) The child's educational status and setting, and the
               department's efforts to maintain educational stability for
               the child in out-of-home placement;

           (E) The child's living situation;

           (F) The child's fear of being in the family home;

           (G) The impact of out-of-home placement on the child;

           (H) Services provided to the child and family; and

           (I) The department's efforts to maintain connections
               between the child and the child's siblings, if they are
               living in different homes;

       (2) The initial and any subsequent reports of harm and
           threatened harm to the child;

                                                        (continued...)

[22](...continued)

    (3) Dates and reasons for the child's out-of-home placement;

        description, appropriateness, and location of the placement; and who has placement responsibility;

    (4) Facts regarding the alleged perpetrators of harm to the child, the child's parents, and other family members who are parties to the court proceedings, which facts shall include:

        (A) Birthplace and family of origin;

        (B) Manner in which the alleged perpetrator of harm was parented;

        (C) Marital and relationship history; and

        (D) Prior involvement in services;

    (5) Results of psychiatric, psychological, or developmental valuations of the child, the alleged perpetrators, and other family members who are parties;

    (6) Whether there is a history of abusive or assaultive conduct by the child's family members and others who have access to the family home;

    (7) Whether there is a history of substance abuse by the child's family or others who have access to the family home;

    (8) Whether any alleged perpetrator has completed services in relation to any history identified in paragraphs (6) and (7), and acknowledged and accepted responsibility for the harm to the child;

    (9) Whether any non-perpetrator who resides in the family home has demonstrated an ability to protect the child from further harm and to ensure that any current protective orders are enforced;

  (10) Whether there is a support system available to the child's family, including adoptive and hanai relatives, friends, and faith-based or other community networks;

  (11) Attempts to locate and involve extended family, friends, and faith-based or other community networks;

  (12) Whether the child's family has demonstrated an understanding of and involvement in services that have been recommended by the department or court-ordered as necessary to provide a safe family home for the child;

  (13) Whether the child's family has resolved identified safety issues in the family home within a reasonable period of time; and

  (14) The department's assessment, which shall include the demonstrated ability of the child's family to provide a safe family home for the child, and recommendations.

   (b) The court shall consider the likelihood that the current
                             (continued...)

43

(Supp. 2010) clearly express a legislative preference in favor of

---

[22] (...continued)
situation presented in the safe family home factors set forth in subsection (a) will continue in the reasonably foreseeable future.

[23]   HRS § 587A-9 provides:

   **587A-9   Temporary foster custody without court order.**   (a)   When the department receives protective custody of a child from the police, the department shall:

   (1) Assume temporary foster custody of the child if, in the discretion of the department, the department determines that the child is subject to imminent harm while in the custody of the child's family;

   (2) Make every reasonable effort to inform the child's parents of the actions taken, unless doing so would put another person at risk of harm;

   (3) Unless the child is admitted to a hospital or similar institution, place the child in emergency foster care while the department conducts an appropriate investigation, with placement preference being given to an approved relative;

   (4) With authorized agencies, make reasonable efforts to identify and notify all relatives within thirty days of assuming temporary foster custody of the child; and

   (5) Within three days, excluding Saturdays, Sundays, and holidays:

      (A) Relinquish temporary foster custody, return the child to the child's parents, and proceed pursuant to section 587A-11(3), 587A-11(4), or 587A-11(5);

      (B) Secure a voluntary placement agreement from the child's parents to place the child in foster care, and proceed pursuant to section 587A-11(5) or 587A-11(7); or

      (C) File a petition with the court.

   (b) Upon the request of the department and without regard to parental consent, any physician licensed or authorized to practice medicine in the State shall perform an examination to determine the nature and extent of harm or threatened harm to the child under the department's temporary foster custody.

[24]   HRS § 587A-10 provides:

   **§587A-10   Relatives; foster placement.**   (a) The department shall provide the child's relative an application to be the child's resource family within fifteen days of the relative's request to provide foster placement for the child. If the application is submitted and denied, the department shall provide the applicant with the specific reasons for the denial and an explanation of the procedures for an administrative appeal.

   (b) The department and authorized agencies shall make reasonable efforts to identify and notify all relatives of the child within thirty days after assuming foster custody of the child.

placements with relatives at all stages of a case falling under HRS Chapter 587A.

We agree with Foster Parents, who argue that except for HRS § 587A-9, none of the HRS provisions cited to by DHS contains an explicit or mandatory preference in favor of relative placements. HRS § 587A-9 pertains only to "temporary foster custody without court order" and provides for "placement preference being given to an approved relative" when a child is placed in emergency foster care. HRS §§ 587A-10 and -26(e)(2) (Supp. 2010),[25] which concern relative placements, provide that any relatives shall be identified, if possible, and given the opportunity to apply for foster custody, if they express interest in taking a child, within the first thirty days after the child is taken into foster custody by DHS. Chapter 578A does not require that relatives must be given preference in placing a child after the birth parents' rights have been terminated. Although placement with a relative after termination of parental rights may have certain advantages, the paramount and overriding consideration is the best interests of the child.

Regardless, assuming there was a preference for relative placement, it would not supercede "best interest" considerations. See, e.g., HRS §§ 587A-30(b)(7), -31, and -33(a)(3); March 2003 Doe, 101 Hawai'i at 231, 65 P.3d at 178.

Also, as the VGAL Program argues, this court already ruled in Nov. 2003 Doe that there is no kinship preference that requires the family court to give relatives placement priority. There, the mother argued that HRS § 587-1[26] gave priority to the

---

[25] HRS § 587A-26(e)(2) provides that at temporary foster custody hearings, the court may order that "[t]he child's family members who are parties provide the department or another authorized agency the name and addresses of other relatives and friends who are potential visitation supervisors or resource families for the child[.]

[26] HRS § 587-1 set forth the policy of § 587-73(e), which provided that the "court shall order a permanent plan for the child within three years of the date upon which the child was first placed under foster custody by the court, if the child's family is not willing and able to provide the child with a safe family home, even with the assistance of a service plan." Nov. 2003 Doe, 103 Hawai'i at 136, 80 P.3d at 26. HRS § 587-1 provided the following in relevant part:

(continued...)

family with respect to the permanent placement of the children and that there were no other statutory priorities. 103 Hawai‘i at 136, 80 P.3d at 26. This court held that in 1998 the legislature amended § 587-1 and the policy of the law to emphasize an interest in protecting the safety and best interests of the child over a preference for reunification with the family.[27] 103 Hawai‘i at 136-37, 80 P.3d at 26-27.

---

[26](...continued)
> This permanent planning should effectuate placement with a child's own family when possible and should be conducted in an expeditious fashion so that where return to the child's family is not possible as provided in this chapter, such children with [sic] be promptly and permanently placed with responsible, competent, substitute parents and families secured by adoption or permanent custody orders.

Nov. 2003 Doe, 103 Hawai‘i at 136, 80 P.3d at 26.

[27] Pursuant to 1998 Act 134, HRS § 587-1 then stated:

> **Purpose; construction.** This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm. Furthermore, this chapter makes provisions for the service treatment, and permanent plans for these children and their families.

> The legislature finds that children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes. The legislature finds that children who have been harmed or are threatened with harm are less likely than other children to realize their full educational, vocational, and emotional potential, and become law-abiding, productive, self-sufficient citizens, and are more likely to become involved with the mental health system, the juvenile justice system, or the criminal justice system, as well as become an economic burden on the State. The legislature finds that prompt identification, reporting, investigation, services, treatment, adjudication, and disposition of cases involving children who have been harmed or are threatened with harm are in the Children's, their families', and society's best interests because the Children are defenseless, exploitable, and vulnerable.

> The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families if the families can provide safe family homes, and with timely and appropriate service or permanent plans to ensure the safety of the child so they may develop and mature into responsible, self-sufficient, law-abiding citizens. The service plan shall effectuate the child's remaining in the family home, when the family home can be immediately made safe with services, or the child's returning to a safe family home. The service plan should be carefully formulated with the family in a timely manner. Every reasonable opportunity should be provided to help the
> (continued...)

The purpose and construction of the CPA is now codified in HRS § 587A-2.  Nothing in that statute or its legislative history suggests that the emphasis on a child's safety and best interests no longer takes precedence over a preference for family placements.

DHS cites to 1989 Doe to support this point, arguing that "case law give[s] the preference to place children in foster care with their family."  1989 Doe held that the family court was right to find that DHS did not clearly err in deciding to remove the child from the home of non-relative foster caretakers and place her in an adoptive home where her brothers resided.  7 Haw. App. at 558, 784 P.2d at 881.  The holding was based in large part on a statutory preference for relative placements, which, has since been superceded by an interest in promoting a child's safety and best interests.  See Nov. 2003 Doe, 103 Hawaiʻi at 136-37, 80 P.3d at 26-27.

### 2.    Federal Law

DHS maintains that Congress has conditioned federal funding to states that comply with federal child protection/welfare laws that require them to give placement preference to relatives over non-relatives.  DHS does not cite to

---

[27](...continued)

child's legal custodian to succeed in remedying the problems which put the child at substantial risk of being harmed in the family home.  Each appropriate resource, public and private, family and friend, should be considered and used to maximize the legal custodian's potential for providing a safe family home for the child. Full and careful consideration should be given to the religious, cultural, and ethnic values of the child's legal custodian when service plans are being discussed and formulated. Where the court has determined, by clear and convincing evidence, that the child cannot be returned to a safe family home, the child will be permanently placed in a timely manner.

The department's child protective services provided under this chapter shall make every reasonable effort to be open, accessible, and communicative to the persons affected in any manner by a child protective proceeding; provided that the safety and best interests of the child under this chapter shall not be endangered in the process.

This chapter shall be liberally construed to serve the best interests of the Children and the purposes set out in this chapter.

103 Hawaiʻi at 137, 80 P.3d at 27.

any authority to support the notion that this exercise of Congress's Spending Power required the family court to accept DHS's placement recommendation, and nothing in HRS Chapter 587A or in any case law construing Chapter 587A suggests that it does.

### 3. Right to Family Association under U.S. Constitution

DHS also maintains that its placement decision was in accord with the right of familial association protected by the Fourteenth Amendment of the U.S. Constitution.

In <u>United States v. Wolf Child</u>, 699 F.3d 1082, 1091-92 (9th Cir. 2012), the United States Court of Appeals for the Ninth Circuit summarized the constitutional right to familial association as follows:

> The substantive due process right to family integrity or to familial association is well established. A parent has a fundamental liberty interest in companionship with his or her child. It is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court. This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. Far more precious than property rights, parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men, and to be more significant and priceless than liberties which derive merely from shifting economic arrangements.
> . . . .
>
> The parents' fundamental right to familial association is not absolute and must be balanced against the interests of the state, and when conflicting, against the interests of the children. Interference with that right, however, requires a powerful countervailing interest and strict adherence to procedures is required.

(Quotation marks, citations and brackets omitted.)

> [T]he constitutional liberty interest in the maintenance of the familial relationship is not absolute. The interest of the parents must be balanced against the interests of the state and, when conflicting, against the interests of the children.

<u>McCue v. South Fork Union Elementary School</u>, 766 F. Supp. 2d 1003, 1008 (E.D. Cal. 2011) (internal quotation marks and citations omitted).

In <u>Osborne v. County of Riverside</u>, 385 F. Supp. 2d 1048, 1053 (2005), the United States District Court for the Central District of California, Eastern Division examined whether the right to familial integrity and association extended to a

child's close relatives, such as a grandmother or aunt. The District Court held that a close relative possessed a liberty interest in familial integrity and association with respect to a child, where the relative and child had a long-standing custodial relationship such that together they constituted an existing family unit. Id. at 1054-55. A mere genetic link was not enough. Id. at 1054-55.

Assuming *arguendo* that the right to familial association extends to Maternal Aunt, which is an issue we do not address, DHS lacks the right to vicariously assert that right on her behalf. See Freitas v. Admin Dir. of the Courts, 104 Hawai'i 483, 486, 92 P.3d 993, 996 (2004) (internal quotation marks omitted) ("Constitutional rights may not be vicariously asserted."); Powers v. Ohio, 499 U.S. 400, 410 (1991) ("In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.").

The United States Supreme Court has "recognized the right of litigants to bring actions on the part of third parties, provided three important criteria are satisfied": (1) the litigant has suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute, (2) the litigant has a close relationship to the third party, and (3) there is some hindrance to the third party's ability to protect his or her own interests. Powers, 499 U.S. at 410-11.

In its Reply Brief, DHS argues that it meets the three-part test set forth in Powers. DHS argues that it meets the first exception, due to its "obligation to enforce and follow the laws regarding family/relative placements that are in accord with the protected liberty interest of family association." Regarding the second exception, DHS argues that it is in a close relationship with AS and Maternal Aunt, given its status as AS's permanent custodian. With regard to the third exception, DHS argues that "AS's VGAL advocates against this proposed family/relative placement."

Without addressing DHS's arguments regarding the first and second exceptions, we hold that DHS fails to meet the third exception. The right to familial association would belong to Maternal Aunt. DHS has not shown that Maternal Aunt is somehow hindered from asserting this right, e.g., prevented from appealing from the family court's ruling or intervening in the instant appeal.

Given the foregoing, we hold that DHS lacks standing to assert this argument.

### 4. DHS's Kinship Policy

DHS argues that the family court erred "by focusing on DHS' family placement policy preference (that is in accord with Federal and Hawaii law)." Related to this point is DHS's contention that FOFs 89 and 115 are clearly erroneous. FOF 89 provides, "DHS supports placement of [AS] with [Maternal Aunt] because of its policy in favor of kin placements." FOF 115 provides, "The application in this case of DHS's policy regarding placement with kin, considering all of the circumstances in this case, is not in [AS's] best interests."

In the proceedings below, the family court received into evidence the following exhibits submitted by Dean: "DHS Policy Directive PA 2005-5" (2005-5 Policy), "DHS Policy Directive PA 2005-7" (2005-7 Policy), and "DHS Policy Directive PA 2005-8" (2005-8 Policy) (collectively, Policy Directives). The 2005-5 Policy states, "This policy directive affirms [the Child Welfare Services Branch's (CWSB's)] policy to seek and assess relatives or kin as foster, adoptive, and/or permanent placement resources for children under the Department's voluntary, court-ordered foster or permanent custody and that relatives or kin placement is preferred to maintain family connections." The 2005-7 Policy states that "[P]lacement with kin meeting CWSB licensing requirements **shall be a priority** in order to maintain life-long and enduring family connections and as a permanent resource for children." Finally, the 2005-8 Policy states that "[the 2005-5 Policy] reaffirms [DHS's] policy to seek and assess kin as foster, adoptive, and/or permanent placement for children under [DHS's] custody and that kin

50

placement **shall be a priority** to maintain life-long family connections." The 2005-8 Policy includes maternal relatives in its definition of "kin."

At trial, Koyanagi testified that in 2004 and 2005, then-director of DHS Lillian Koller publicly pronounced that DHS had a policy of placing children with relatives. DHS did not blindly adhere to a policy of placing foster children with relatives but believed that such placements were better for children. DHS preferred to place AS with Maternal Aunt because she was a relative and would provide AS with access to her extended family. If it were not for AS and Maternal Aunt's blood relationship, there would be no reason for DHS to recommend placing AS with Maternal Aunt.

Tsutsui testified that DHS recommended that AS be placed with Maternal Aunt primarily based on Maternal Aunt's status as a relative. It was DHS's policy to favor relative placements alone that distinguished Maternal Aunt's home from Foster Home.

The family court was within its discretion to consider the Policy Directives when making its "best-interest" determination regarding DHS's placement recommendation.[28] See 2001 Doe, 95 Hawai'i at 190, 20 P.3d at 623 (internal quotation marks, ellipsis, brackets and citations omitted) ("It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact."). There is substantial evidence to support FOFs 89 and 115, and they are not clearly erroneous.

If DHS means to argue that the family court erred in focusing on the Policy Directives without considering that they were based on federal and Hawai'i law establishing a preference for placements with family, as we have discussed, DHS lacks standing to assert a constitutional right on behalf of Maternal

---

[28] We note that DHS, itself, relies on its Policy Directives in its opening brief to support its assertion that its decision that placing AS with Maternal Aunt was in line with federal and state law establishing a preference for family placements.

Aunt, and HRS Chapter 587A does not create a preference for a relative placement after parental rights have been terminated.

DHS also cites to FOF 90 to support this point. FOF 90 provides, "DHS did not proffer any specific research or studies that show that foster children do better in the long run in relative placements than in non-relative placements." DHS argues that the FOF is clearly erroneous because "research supporting family placement, provided by DHS to [Foster Parents], is part of the record. [R. 1036-1037.]" The pages to which DHS cites do not contain any research findings. The first page is a "Notice of Termination or Reduction of Service," notifying Foster Parents that DHS was revoking their foster home license. The second page is a "Notice of Hearing Motion." DHS has not met its burden to show that the FOF is clearly erroneous.

## F. Passage of Time

DHS argues that the family court erred as a matter of law by failing to consider the length of time AS lived with Foster Parents -- along with associated issues, such as AS's relationships -- when "[t]here was a two-year delay from when DHS approved Maternal Aunt for placement on Maui and made its initial plans to place AS in October, 2009 to the placement trial and decision in October, 2011, to the detriment of Maternal Aunt, who in large part did not cause the delays." DHS has not shown and we find no evidence that the court failed to consider any of the delays.

### 1. Delay in Setting Initial Trial Date

DHS argues that the family court's October 2009 and April 2010 order resulted in a delayed initial trial date of October 2010.

#### October 2009 Order

DHS argues that the family court failed to consider how its October 28, 2009 Orders Concerning Child Protective Act (October 2009 Order) -- which "required" DHS to give Father a reasonable opportunity to reunify with AS and "prevented" DHS from placing AS with Maternal Aunt -- created a delay that negatively impacted DHS's efforts to place AS with Maternal Aunt.

We agree with Foster Parents that DHS mis-characterizes

52

the facts by arguing that the family court prevented it from placing AS with Maternal Aunt, when DHS asked the court at an October 28, 2009 pre-trial hearing for more time before placing AS with Maternal Aunt to allow Father to reunify with AS. The order that "DHS shall make best efforts to increase visits between Father & [AS]" merely memorialized the court's oral granting of DHS's request at the October 28, 2009 hearing.

DHS cites to no authority to support the notion that the family court had to consider how this delay negatively impacted DHS's efforts to place AS with Maternal Aunt, and we find none.

DHS alternatively argues that its duty to make reasonable efforts to effectuate AS's reunification with Father, who lived on Oʻahu, in accordance with his constitutional liberty and privacy interests, is what prevented DHS from placing AS with Maternal Aunt, who lived on Maui. DHS attributes this conflict with a problem in the "system"; however, DHS does not associate this systemic problem with any error or omission by the family court.

### April 2010 Order

DHS argues that the family court's April 21, 2010 oral denial of DHS's motion for immediate removal of AS to Maui, in which the family court declined to address the placement issue until after the completion of DHS's Motion for Permanent Custody, further prevented DHS from exercising its placement discretion. At an April 21, 2010 hearing, the court orally denied without prejudice DHS's motion for immediate review to move AS to Maui, stating that the permanency trial would be held in two weeks and removal of AS to Maternal Aunt's home "may be an issue . . . after the permanency trial . . . ." DHS cites to no authority to support the notion that the court had to consider how this delay negatively impacted DHS efforts to place AS with Maternal Aunt, and we find none.

### 2. Trial Continuances

DHS argues that the family court's October 2010 order

(October 2010 Order)[29] and March 23, 2011 Orders Concerning Child Protective Act (March 2011 Order) caused delays that prevented AS from developing a relationship with Maternal Aunt.

### October 2010 Order

In the October 2010 Order, the family court ordered DHS not to "remove [AS] from Foster [Home] except in the case of imminent harm." DHS cites to no authority to support the notion that the court had to consider how this delay negatively impacted DHS's efforts to place AS with Maternal Aunt, and we find none. Regardless, the delay was related to the Foster Home licensing issue, which resulted from DHS's own error.

### March 2011 Order

In the March 2011 Order, the family court continued the permanency trial to June 2011 and, among other things, denied DHS's motion to increase visits between AS and Maternal Aunt or place AS with Maternal Aunt, authorized DHS to review and copy documents related to Maternal Aunt's divorce, and ordered Foster Parents to participate in psychological evaluations. Again, DHS cites to no authority to support the notion that the family court had to consider how this delay prevented DHS from placing AS with Maternal Aunt, and we find none.

### G. Continuing DHS's Status as Permanent Custodian

DHS argues that the family court erred as a matter of law by denying DHS's request to be discharged as AS's permanent custodian, after ordering DHS not to place AS with Maternal Aunt. Related to this point is DHS's contention that COL 10 is wrong. That COL provides, "Notwithstanding the court's findings and conclusions that DHS has abused its discretion in this case, there is not good cause to remove DHS as [AS's] permanent custodian."

DHS maintains:

> While the DHS concedes that the family court has the legal authority to review the placement decisions made by DHS or any other designated foster or permanent custodian under

---

[29] When referring to an "October 2010" order, DHS cites to page 911 in the record on appeal, which is part of the court's December 30, 2010 order, in which the court grants Foster Parents' Motion to License Home and for Trial. It appears that the order was filed and dated in December 2010, but issued in October 2010.

> Chapter 587A, the family court cannot award foster custody or permanent custody to DHS and simultaneously restrict DHS's statutory placement authority as a foster or permanent custodian. If the family court finds that DHS or any other authorized agency abuses its placement authority it must vest foster or permanent custody in another authorized agency.
>
> . . . .
>
> The clear intent of the Hawaii Legislature is that if the family court vests foster custody or permanent custody in an authorized agency, that the family court gives that authorized agency the authority to determine where and with whom the child shall live.

As we have already discussed, pursuant to case law and HRS Chapter 587A, the family court can "restrict DHS's statutory placement authority as a foster or permanent custodian," where it is in a child's best interest. See Part III.B.2 in this discussion. Further, HRS § 587A-15(b) (Supp. 2010) provides that "[t]he court, in its discretion, may vest foster custody of a child in any authorized agency . . . if the court finds that it is in the child's best interests to do so."

DHS cites to March 2003 Doe, 101 Hawai'i at 229, 65 P.3d at 176, to support this point, arguing that there, the Hawai'i Supreme Court agreed with DHS's contention that "if the family court finds that an authorized agency abused it's [sic] placement authority, the family court should revoke its award of custody to DHS . . . ." In March 2003 Doe, DHS's main point was that the family court had exceeded its statutory authority by awarding foster custody of the child to DHS and simultaneously ordering DHS to place the child with her aunt in an unlicensed foster boarding home against DHS's recommendation. Id. at 228-29, 65 P.3d at 175-76. DHS argued that the supreme court's order prohibited DHS from exercising its placement authority as foster custodian. Id. at 229, 65 P.3d at 176. DHS also argued that because the family court rejected DHS's recommendation, the supreme court "should have revoked its award of foster custody to DHS and vested foster custody in Aunt." Id. However, it is clear from the opinion as a whole that when the supreme court stated that it "agree[d] with DHS," it was agreeing with DHS's main point, not its point regarding revocation of DHS's custody. The supreme court never held that where the family court rejects

a DHS placement recommendation, the supreme court should revoke DHS's custody.

DHS cites to no persuasive authority to support the notion that the family court could not order DHS to continue acting as AS's permanent custodian, and we find none. COL 10 is not wrong.

## IV.   CONCLUSION

The "Order Re:  Trial on Placement" filed on November 18, 2011 in the Family Court of the First Circuit is affirmed.

On the briefs:

Patrick A. Pascual
Mary Anne Magnier
Jay K. Goss
Deputy Attorneys General
for Petitioner-Appellant
Department of Human Services.

Francis T. O'Brien
for Respondent-Appellee
for Foster Parents.

Kimberly S. Towler
for Respondent-Appellee
Volunteer Guardians Ad Litem
Program.